**Patricia M. REECHEL, Individually and as Surviving Wife of Jack David Reechel, Deceased, et al.**

v.

**ITALIA DI NAVIGAZIONE SOCIETA PER AZIONI GENOVA a/k/a Italian Steamship Corporation t/a Italian Line, et al.**

**Civ. No. PN–87–564.**

United States District Court, D. Maryland.

June 28, 1988.

Roger L. Smith, Glen Burnie, Md., for plaintiffs.

Geoffrey S. Tobias and Franklin W. Foster, Ober, Kaler, Grimes & Shriver, Balti-

more, Md., for defendants Italian Line and Spanish Line.

Roy L. Mason and Mary Alane Downs, Donahue, Ehrmantraut & Montedonico, Chartered, Baltimore, Md., for defendant R.R. Donnelley & Sons Co.

Benjamin R. Goertemiller and James A. Johnson, Semmes, Bowen & Semmes, Baltimore, Md., for defendant Officine Meccaniche Giovanni Cerutti, S.P.A.

## OPINION

NIEMEYER, District Judge.

On March 21, 1986, Jack D. Reechel, a Baltimore longshoreman, was killed at the Dundalk Marine Terminal while working for Maher Terminals, a stevedoring firm which was unloading containers from the M/V ITALICA. Reechel had transported an overheight, open-top (one whose top is covered with tarpaulin), 40–foot container, which had been unloaded from the vessel, to a storage lot somewhat less than a mile from the dock. He used a small truck, known as a hustler, which towed a chassis on which the container had been mounted. At the storage lot Reechel, apparently having missed the turn into the row to which the container had been assigned for storage, attempted to back the hustler up when it jack-knifed. The container fell onto the hustler, crushing Reechel who died shortly thereafter as a result of his injuries.

Reechel's wife filed this action against, among others, Italia Di Navigazione S.P.A. ("Italian Line"), the owner of the vessel, and Cia Transatlantica Espanola S.A. ("Spanish Line"), which issued the bill of lading, claiming that defendants negligently failed to warn Maher or Reechel of the dangerous condition of the container and its cargo. More particularly, they contend that the load was improperly secured in the container and that it was top-heavy, requiring special handling, both of which are potentially dangerous conditions of which the defendants should have given warning. This suit is brought under 33 U.S.C. § 905, the Longshoremen's and Harbor Workers' Act, in two counts of negligence, one by Reechel's wife on her own behalf and one by her on behalf of Reechel's estate.

On January 29, 1988, two of the defendants, Italian Line and Spanish Line, filed a motion for summary judgment urging dismissal of the case against them. They recite facts that show that the container was transported without incident from Vercelli, Italy, an inland town, to Baltimore. They contend that no one advised them of any dangerous condition and no facts or circumstances suggested one. They contend that they had no duty to open the sealed container to inspect the cargo or its packing. Plaintiff responded by submitting deposition testimony and exhibits, to which a reply was filed. The original discovery deadline of December 13, 1987 was extended by order to February 1, 1988, and all matters submitted have now been considered.

Since the plaintiff has been confronted with a substantial motion challenging the complaint by reason of an alleged absence of evidence as to an essential element of the causes of action alleged, she must now come forward and make a showing that there are facts supporting her claims sufficient to submit the issue to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The record before the Court shows the following:

The container at issue was loaded (or "stuffed") with a printing press by the manufacturer and shipper, O.M.G. Cerutti ("Cerutti") in Leghorn, Italy. The press had been ordered by the Chicago-based Donnelley & Sons which had hired its regular freight forwarder, Salviatti & Santori ("Salviatti") to arrange for the transport. Salviatti arranged for F. Ili Bartoli S.N.C ("Bartoli") to truck the empty container from the Spanish Line marshaling yard in Leghorn to Cerutti's business in Vercelli and to return the stuffed container from Vercelli to Leghorn. Salviatti also made the arrangements with Spanish Line for ocean carriage of the press from Leghorn to Baltimore. Spanish Line booked space

for the container, as well as other containers stuffed with other parts of the printing press, on Italian Line's M/V ITALICA. Spanish Line and Italian Line work together to provide their "Med American Express Service" between Mediterranean countries and the U.S. The Med American Express Service made arrangements with Maher for the off-loading of the containers in Baltimore.

The container in question was actually stuffed by Cerutti's employees. George E. Stiver, Donnelley's Corporate Transportation Manager, observed the stuffing of some of the 40-foot containers and found it satisfactory, although there is no evidence to indicate that he observed the stuffing of the particular container at issue. There is no evidence to indicate that any agent or employee of either of the defendants observed the stuffing of the container. After the stuffing was completed, a Donnelley tarpaulin was placed over the top of the container and the doors to the container were sealed.

The container was transported by truck by Bartoli from Cerutti's factory in Vercelli to the ocean terminal in Leghorn, a trip of more than 150 kilometers over hilly terrain, with no reported incident. The container was received by defendants' terminal operator in Leghorn and a second seal was attached. There was no report of any problem. Because of its unusual size, the container was among the last to be loaded onto the M/V ITALICA. It was stowed at the top of a stack in accordance with Stiver's direction. There was no evidence of any difficulty during loading, and none was reported by Stiver.

Due to a change in plans, the M/V ITALICA docked first in Norfolk rather than New York, requiring a shifting of several containers including the one at issue here. There was no evidence of any problem with the container either during the shifting in Norfolk or during the voyages to Norfolk or Baltimore.

Cargo discharge operations began shortly after the vessel's arrival at Baltimore's Dundalk Marine Terminal. At some time during the afternoon of March 21, 1986, the discharge was observed by Stiver, Gary Kardian of Spanish Line, and Mary Wade of The Wilson Group USA, Donnelley's inward freight forwarder. None of the three actually observed the unloading of the container at issue here. There was no evidence of any problem with the unloading by Maher's longshoremen. The longshoremen used "emergency gear," consisting of four chains suspended from the corners of a spreader, to unload the container because its top, still covered by the tarpaulin, required special treatment. Once unloaded, the container was placed or "landed" on a forty-foot chassis which had been utilized shortly before without incident. There was no evidence of any problem during the unloading of the container or its loading onto the chassis prior to the time Mr. Reechel drove off with it. The two seals which had earlier been placed on the container had not been disturbed and they remained sealed even after the accident.

Reechel drove a "hustler" or small tractor which pulled a chassis on which the container was loaded for somewhat less than a mile to the assigned location for storage. When he drove past the designated slot for the container, he reversed direction causing the chassis and the hustler to come perpendicular to each other. The load, which was weighted to the left, was encouraged additionally to follow that direction by the jack-knife movement as well as by a slope in the road bed. The load overturned, falling onto the hustler and Reechel.

The investigation of the accident revealed that the chassis was raised to its higher position aggravating any top heavy condition that may have existed. Inside the container, the wires and the D rings anchoring the wires were broken. The surveyor retained by plaintiff concluded that:

> "The securement of the unit in the container was insufficient with noted floor blocking and bracing for a unit of this size and weight."

The damage to the container was so extensive it was considered "a total constructive loss."

Plaintiff's suit has been brought for negligence against Italian Line and Spanish Line under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) which provides in pertinent part:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

Prior to amendments made to this Act in 1972, the liability of a shipowner to a longshoreman was described in terms of seaworthiness of the vessel. Under this standard, a longshoreman could recover against a shipowner upon proof of unseaworthiness without proof of fault on the part of the shipowner other than an unsafe, injury-causing condition on the vessel. The 1972 Amendments allowed increased compensation to longshoremen from the stevedore, and at the same time changed the standard of liability against the shipowner from one of unseaworthiness to one of negligence.

This standard was articulated by the Supreme Court in *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1622, 68 L.Ed.2d 1 (1981):

"This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." *Id.* citing *Marine Terminals v. Burnside Shipping Co.* 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969).

Elaborating, the Court said:

"We are of the view that absent contract provision, positive law, or custom to the contrary ... the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself. This conclusion is plainly consistent with the congressional intent to foreclose the faultless liability of the shipowner based on a theory of unseaworthiness or nondelegable duty. The shipowner, within limits, *is* entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations." 451 U.S. at 172, 101 S.Ct. at 1624.

Plaintiff has cited no facts which would indicate any negligence on the part of these defendants. Although she offers evidence in the form of a report by her surveyor that the container at issue was top-heavy and had a center of gravity to the left of center, she fails to offer any evidence which shows either that of these defendants knew this or that they should have known this. Absent such knowledge—actual or constructive—on the part of these defendants, there can be no duty on their part to provide a warning.

Plaintiff has offered evidence in the form of a report by her surveyor that after the accident the printing press "was found to

be against the left side of the container" and that "prior to the alleged incident it was noted that the cargo in container SCXU 445687–9 had shifted left against the left container wall." Again, neither this report nor any other evidence demonstrates any actual or constructive knowledge of this condition on the part of either Italian Line or Spanish Line. Finally, plaintiff points to the fact that these defendants failed to warn Maher and Reechel of special handling requirements for the container in issue. But, again, plaintiff has failed to demonstrate any knowledge on the part of either defendant, either actual or constructive, of such special handling requirements. Plaintiff has shown that the container arrived at the pier at Leghorn, Italy on a low boy flat bed truck rather than on a chassis, but plaintiff has failed to demonstrate that the use of this method of transportation was so unusual as to put these defendants on notice of any special handling requirement. In fact, all the containers came on low boy flat bed trucks.

In her complaint, plaintiff alleges that these defendants were negligent in loading or causing the press to be loaded in the container, in failing to secure the press, in using insufficient tie downs, and in failing to supervise persons performing such work. This work, however, was performed by the manufacturer and shipper, Cerutti, rather than by defendants Italian Line and Spanish Line, and plaintiff has failed to point to any actual or constructive knowledge on their part of any problem in the stuffing process.

■ Defendants did agree in their contract with Maher to "inspect the stowage of containers to ensure adequacy of stowage prior to the vessel's departure." But this cannot be read to require defendants also to inspect the stuffing of a container performed by the shipper prior to the time that defendants, as the carrier, received it for carriage.

■ At oral argument plaintiff also directed the Court to the additional contractual undertaking of defendants to provide Maher with:

"all necessary information, instructions and forms covering vessel and containers, including container loading, discharging, stowage, vessel's trim, condition of containers, cargo requiring special handling and billing instructions to enable [Maher] to provide efficient and economical service."

Plaintiff argues that this is a specific contractual undertaking that overcomes the statutory changes made by Congress in 1972 when it amended the Longshoremen's Act. The Court disagrees.

■ In 1972 Congress specifically intended to establish negligence as the exclusive basis of liability of a shipowner to a stevedore who is covered by the Act. Any contractual undertaking in a stevedoring contract that is designed to alter that basis of liability would have to be clear and specific. The provision cited by plaintiff would require the defendants to pass on information they received from the shipper as well as that which was learned in the course of the voyage. The purpose of the provision is directed to facilitating the unloading activities of Maher to make them efficient and economical. Thus, for example, the defendants would provide instructions relating to containers in need of special handling, such as they did in this case with respect to the flat platform container, thereby enabling the stevedore to engage special equipment as necessary.

No evidence was offered that anyone considered the container in question to be in need of special handling and the defendants were not so advised by the shipper.

In ruling on a motion for summary judgment, this Court must apply the standards set down by the Supreme Court in *Celotex Corp. v. Catrett* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986):

"... the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be

444

'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of her case with respect to which she has the burden of proof." *Id.* at 322–23, 106 S.Ct. at 2553.

Once a challenge has been issued, the burden is upon the nonmoving party to come forward with enough evidence to establish a *prima facie* case with regard to dispositive issues. Plaintiff in the instant case has failed to meet this burden. The element of duty is an essential one to plaintiff's case and one on which she will bear the burden at trial. Absent a showing of knowledge on the part of these defendants of some condition or requirement that would impose a duty to warn, she has failed to establish the existence of a duty.

■ She contends that the defendant shipowners had a duty to make inquiry about the load or to inspect the contents of the containers. We conclude today that, in the absence of knowledge or in the absence of such circumstances that would reasonably put the shipowner on notice, the shipowner has no duty to inquire about specific containers or undertake to inspect the contents of sealed containers. Accordingly, these defendants are entitled to judgment as a matter of law.

The Court will enter a separate order granting the motion of the defendants Italian Line and Spanish Line.

### ORDER

In accordance with the foregoing Memorandum opinion, it is hereby ORDERED, this 28th day of June, 1988, by the United States District Court for the District of Maryland, that:

The motion of defendants Italia Di Navigazione S.P.A. and Cia Transatlantica Espanola S.A. for summary judgment is GRANTED.